NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0054n.06

Case No. 21-3832

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jan 25, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JAMIE MARQUARDT, | ) | |
| Plaintiff-Appellant, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| NICOLE CARLTON, et al. | ) | OHIO |
| Defendants-Appellees. | ) ) | |
| | ) | OPINION |

Before: GILMAN, BUSH, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** When a Cleveland police officer shot and killed twelve-year-old Tamir Rice, protests erupted in Cleveland, capturing the nation's attention. Almost fourteen months later, two posts appeared on the Facebook page of Jamie Marquardt, a Cleveland Emergency Medical Service Captain. The posts expressed the author's wish that he had been the one to shoot Rice. When an investigation determined that Marquardt authored the posts, he was fired. He sued the EMS Commissioner and the City of Cleveland, alleging that the speech reflected in the Facebook posts was protected by the First Amendment. The district court granted summary judgment to defendants and Marquardt appealed. Although we acknowledge the many freedoms that the First Amendment guarantees, in this unique circumstance, defendants had an overriding interest in preserving the public's trust in Cleveland EMS's capacity to serve the public. On that basis, the district court was correct to grant summary judgment to defendants. We affirm.

**I.**

Eight years ago, twelve-year-old Tamir Rice was shot and killed by a police officer. What happened that day has been well documented. A 911 caller reported a "guy in the park with a pistol" that was "probably fake." Dispatchers informed officers that there was a male sitting on a swing pointing a gun at people. Officers responded to the report. Within seconds of arriving at the park, one officer shot Rice. Rice's "pistol" was later determined to be an airsoft gun with the orange toy markings removed. Cleveland EMS responded and transported Rice to the hospital. He died the next day from his injuries. Protestors, decrying the use of lethal force, flooded Cleveland's streets. The controversy over the shooting did not end in its immediate aftermath. Some fourteen months later, the event was once again the focus of national scrutiny when news broke that Cleveland EMS billed Rice's family $500 for his ambulance ride. *Marquardt v. Carlton*, 971 F.3d 546, 550 (6th Cir. 2020) (citing Christine Hauser, *Cleveland Drops Attempt to Collect $500 From Tamir Rice Family*, N.Y. Times (Feb. 11, 2016), https://www.nytimes.com/2016/02/12/us/cleveland-500-bill-tamir-rice-shooting.html (last accessed Jan. 23, 2023)).

Just days later, two posts referring to the shooting appeared on the private Facebook page of Jamie Marquardt, a Cleveland EMS Captain. One stated, "Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad. I am upset I did not get the chance to kill the little criminal fucker." The other said, "How would you feel if you were walking in the park and some ghetto rat pointed a gun in your face? Would you look to him as a hero? Cleveland sees this felony hood rat as a hero." Marquardt denied making the posts, deleted them, and created a new post disavowing their content.

2

Two of Marquardt's co-workers, paramedics, saw the posts the morning they appeared. Both contacted EMS Captain Michael Threat. They expressed worry about Marquardt's well-being and the risk of "potential civil unrest" should the posts be seen by the public because there was already "a lot in the media" addressing the Rice incident.

The reports made their way to EMS Commissioner Nicole Carlton. Carlton requested that the City's Office of Integrity Control investigate. During the investigation, Marquardt remained on the job, denying that he authored the posts.

Within three days of the posts appearing on Marquardt's Facebook page, they caught the eye of the Cleveland NAACP President, who condemned them in an article on Cleveland.com. By then, Marquardt acknowledges, the posts had become a national story.

Roughly a month later, Carlton fired Marquardt, attributing authorship of the posts to him. By making those posts, Carlton concluded, Marquardt violated a host of policies—from EMS's mission statement, pledge to the community, and social media policy to the City's civil service commission rules. Marquardt's termination letter stated that the posts were inflammatory, caused disruption (emphasizing that Marquardt's co-workers "expressed concern for their own welfare and safety"), and cast the EMS division as "disrespectful of the tragedy."

Marquardt disagreed with Carlton's conclusions. Invoking 42 U.SC. § 1983, Marquardt sued Carlton and the City for wrongful termination. Of the many claims asserted by Marquardt, three are at issue here: (1) his claim that defendants terminated him in retaliation for his protected speech; (2) his facial overbreadth challenge to the EMS social media policy, which he asserted entitled him to reinstatement and back pay; and (3) his *Monell* claim that the City failed to properly train Carlton.

The parties filed cross-motions for summary judgment. In resolving those motions, the district court agreed with Marquardt that the EMS social media policy was facially overbroad and enjoined the City from enforcing the policy, but declined to award Marquardt reinstatement with back pay. As to Marquardt's retaliation claim, the district court held that Marquardt's Facebook posts did not address a matter of public concern, meaning that defendants had not violated Marquardt's First Amendment rights by terminating his employment. And because defendants committed no constitutional violation, the district court added, Marquardt's *Monell* claim also failed.

Marquardt appealed. We remanded the case back to the district court for further proceedings on the basis that Marquardt's posts did address a matter of public concern: whether the police officer was justified in shooting Rice, leading to his death. *Marquardt*, 971 F.3d at 553. On remand, the district court, applying the balancing test announced in *Pickering v. Board of Education*, 391 U.S. 563 (1968), held that defendants were nonetheless entitled to summary judgment on Marquardt's First Amendment claim because the City's interest as an employer outweighed Marquardt's free speech interest. The district court also granted summary judgment to the City on the *Monell* failure-to-train claim and denied Marquardt's request for back pay and reinstatement. Marquardt appealed once again.

## II.

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in Marquardt's favor. From that perspective, we must determine whether Carlton and the City showed an absence of a genuine dispute of material fact such that they are entitled to judgment as a matter of law. *Marquardt*, 971 F.3d at 548–59; Fed. R. Civ. P. 56(a).

4

A. Marquardt alleges that Carlton and the City violated the First and Fourteenth Amendments by retaliating against him for the speech in his Facebook posts. To resolve that claim, we ask three questions: first, whether Marquardt engaged in protected speech; second, whether his termination would discourage an individual of "ordinary firmness" from engaging in the activity that led to his discipline; and third, whether his protected speech was a "motivating factor" behind his termination. *Marquardt*, 971 F.3d at 549.

1. Today's case can be resolved by answering the first question, which has multiple components. The first is whether Marquardt's speech was made as a private citizen addressing a matter of public concern, thereby garnering greater protection under the First Amendment. *Id.* We previously ruled that his speech so qualified. *Id.* That being the case, we turn to the next inquiry, the balancing test articulated in *Pickering*, which is a matter of law for the Court to decide. *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) (citation omitted). *Pickering* balancing requires us to assess whether Marquardt's free speech interests outweighed the interests of the City as an employer. *Marquardt*, 971 F.3d at 549 (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1047 (6th Cir. 2014)). Generally speaking, in deciding the degree of protection an employee's speech warrants, the public employer's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Bennett v. Metro. Gov't of Nashville & Davidson County*, 977 F.3d 530, 538 (6th Cir. 2020) (quoting *Connick v. Myers*, 461 U.S. 138, 150 (1983)).

We begin with Marquardt's interest in his speech. It receives significant First Amendment weight for two reasons: its general content and the context in which it was made. Start with the content. *See Connick*, 461 U.S. at 152. In his posts, Marquardt expressed the view that Rice "deserved to be shot because he was waving a gun at other people." *Marquardt*, 971 F.3d at 551. That speech cannot be restricted merely because it is troubling to others. *See, e.g., Snyder v.*

*Phelps*, 562 U.S. 443, 458, 461 (2011) (explaining that the First Amendment protects "hurtful speech on public issues to ensure that we do not stifle public debate"). To the contrary, upsetting speech on public issues still can occupy "the highest rung of the hierarchy of First Amendment values." *Connick*, 461 U.S. at 145 (citing *Carey v. Brown*, 447 U.S. 455, 467 (1980)). That fairly describes Marquardt's posts, which referenced a high-profile public event in distasteful language.

Next, take the time and place of his speech. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Marquardt was terminated for posts made on his private Facebook page while he was at home and not working. That the City seeks to limit his "off-the-job" speech "raises more First Amendment red flags," and confirms Marquardt's recognized interest in speaking freely on these subjects. *See Bennett*, 977 F.3d at 551 (Murphy, J., concurring).

We then proceed to balance Marquardt's interest against the City's interest as an employer. Assessing the City's interest obliges us to consider whether Marquardt's speech (1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary, (3) impedes the performance of Marquardt's duties or interferes with regular operations of the enterprise, or (4) undermines the City's mission. *Id.* at 540 (citing *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). Together, these factors center on the City's effective functioning as a public agency. *Id.* (citing *Rankin*, 483 U.S. at 388).

Commissioner Carlton testified that she believed City services would be disrupted if Marquardt was identified as the author of the posts. Her conclusion, she explained, was informed by earlier "civil unrest within the City of Cleveland related to the Tamir Rice incident." Any visceral reaction to Marquardt's posts, Carlton predicted, would lead to further "protest[s]," "disharmony amongst EMS staff," and employees "refus[ing] to work with Mr. Marquardt."

6

Her conclusion is well taken. Marquardt's posts were made in an environment where public reaction to the shooting had been explosive. Those posts, it bears adding, appeared just days after the City came under fire for billing Rice's family for his ambulance transport. At the time of the posts, in other words, the Rice shooting had not faded from the public eye, or the public's ire. And in the midst of that uneasy atmosphere, Marquardt's posts prompted co-workers to express their concerns to supervisors and sparked a critical statement from the Cleveland NAACP President that ran in the local news. *See Bennett*, 977 F.3d at 542. All things considered, Carlton's predictions about the controversy that would follow from Marquardt being identified as the author were grounded in the already-bubbling disturbance.

Carlton's finding that the posts could undermine EMS's pledge to "treat[] our patients with dignity and respect" by portraying the unit as "insensitive" and "uncaring" was also a reasonable view. Recall that Marquardt's posts called Rice (who had been an EMS patient) a "little criminal fucker" and "ghetto rat." Those statements are at odds with EMS constituents' "need to believe that those meant to help them in their most dire moments are fair-minded, unbiased, and worthy of their trust." *Bennett*, 977 F.3d at 538, 542–44 (explaining that a 911 operator's use of the word "niggaz" in a Facebook post could lead to "damaged public perception" and cause "many ills" for an agency that "serves the public directly") (citation omitted).

In sum, both the City and Marquardt have important interests on their respective sides of the scale. How, then, do we balance them? This "Solomonic weighting of interests," we acknowledge, seemingly is in tension with our "interpretive tradition" of considering the Constitution's text, structure, and history. *Id.* at 553 (Murphy, J., concurring) (quoting *Luis v. United States*, 136 S. Ct. 1083, 1101 (2016) (Thomas, J., concurring in the judgment). But we must apply the law as it is. When we do, context and precedent leads us to the conclusion that the

City's interest in preventing the disintegration of public trust in Cleveland EMS's ability to carry out its public service mission overrides Marquardt's interest. An EMS Captain in the very division that transported Rice (a twelve-year-old shot by the police) to the hospital called the boy a "ghetto rat" and expressed a desire to have been the one to kill him. These comments were made in the wake of a gripping national media storm that had reignited just days earlier. In instances like this, where "close working relationships are essential to fulfilling public responsibilities" like the emergency medical services at issue here, we should cede to the employer's decision. *Connick*, 461 U.S. at 151–52. Doing so honors "'the importance of deference' . . . when speech threatens to undermine the functions of organizations charged with maintaining public safety." *Gillis*, 845 F.3d at 684. All told, the charged speech at issue and its actual and predicted disruptive effect on the City's services tip the *Pickering* balance in its favor.

2. Marquardt resists this conclusion on two grounds. He first emphasizes that there was no evidence of actual disruption to the City—no interference with discipline or with harmony among co-workers, no effect on Marquardt's performance or duties, and no actual disruption to EMS services. Even assuming Marquardt is correct, a public employer does not always have to show actual disruption to prevail under the *Pickering* balancing test. *Gillis*, 845 F.3d at 687. Rather, the City may "reasonably predict that the employee speech would cause disruption, . . . in light of 'the manner, time, and place' the speech was uttered, as well as 'the context in which the dispute arose.'" *Id.* (quoting *Rankin*, 483 U.S. at 388). And, as already explained, we see no reason to question the City's prediction of future disruption. *Id.* True, as Marquardt notes, the City waited a month after the posts were made to terminate him. Yet during that time, Marquardt maintained that he did not author the posts. When the City confirmed that he did, he was fired.

Marquardt also urges us not to rely on *Bennett*. There, we held that the City's interest as an employer outweighed a 911 operator's interest in using racially offensive language in a Facebook comment. *See Bennett*, 977 F.3d at 545. Distinguishing *Bennett,* Marquardt notes that Bennett's Facebook profile was public-facing, while Marquardt's was not, and that Bennett identified herself as a city employee, while Marquardt did not. *See id.* at 533. But that accounting ignores the fact that—despite whatever privacy setting Marquardt had on his Facebook page—his posts were not kept private and eventually captured the attention of the Cleveland NAACP President and of Marquardt's co-workers. And although Bennett (unlike Marquardt) was placed on leave the day after her posts appeared, Marquardt was allowed to continue working because he denied that he made the posts. Once the City ultimately concluded that Marquardt had made the posts, he, like Bennett, was deemed unfit to serve in his government position. *See id.* at 535.

B. This conclusion resolves the remainder of Marquardt's appeal. Our holding that Marquardt was not terminated in violation of the First Amendment moots his *Monell* claim against the City, which centered on the City's purported failure to train its workforce against impermissibly restricting employee speech. *See Scott v. Clay County*, 205 F.3d 867, 878–79 (6th Cir. 2000) (no *Monell* liability without an underlying constitutional violation). Marquardt's request for reinstatement with back pay due to the City's purportedly overbroad social media policy also fails. The City discharged Marquardt for violating eight other regulations as a result of his Facebook posts—none of which the district court found were unconstitutional. If the social media policy did not exist, in other words, the City would have "reached the same decision as to" Marquardt's employment. *Cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977) (noting that an adverse employment action based in part on conduct protected by the First Amendment does not necessarily amount to a violation justifying remedial action if the

protected conduct was not a but-for cause of the adverse action). As a result, the City's overbroad social media policy would not make Marquardt's termination unlawful when that decision was justified under numerous other policies. And because we affirm the district court on the merits, Marquardt's request to vacate the district court's fees and costs order is moot.

\* \* \* \* \*

We affirm the judgment of the district court.

10